**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
DENNIS KUCINICH, et al.,                  )
)
Plaintiffs,           )
)
v.                        )        Civil Action No. 11-1096 (RBW)
)
BARACK OBAMA, et al.,                     )
)
Defendants.           )
_____)

**MEMORANDUM OPINION**

This case in which the plaintiffs, ten members of the United States House of

Representatives, filed a five-claim complaint against the defendants alleging, among other

things, violations of the War Powers Clause of the United States Constitution, U.S. Const. art. I,

§ 8, cl. 2, and the War Powers Resolution, 50 U.S.C. §§ 1541-1548 (2006), is before the Court

on the defendants' motion to dismiss. For the reasons explained below, the defendants' motion

will be granted.[1]

**I.      BACKGROUND**[2]

Viewed in the light most favorable to the plaintiffs, the facts currently before the Court

are as follows. On March 19, 2011, President Barack Obama ordered United States military

forces to attack the "armed government forces of Libya." Compl. ¶ 31. "Before attacking the

government of Libya, President Obama did not seek or receive [the] approval of Congress in any

---

[1]      In deciding the defendants' motion, the Court considered the following filings made by the parties: the
Complaint for Injunctive and Declaratory Relief ("Compl."); the Memorandum in Support of Defendants' Motion to
Dismiss ("Defs.' Mem."); the Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants'
Motion to Dismiss ("Pls.' Opp'n"); and the Reply in Support of Defendants' Motion to Dismiss ("Defs.' Reply").

[2]      Because the defendants' motion to dismiss raises purely legal questions, the Court will only briefly describe
the facts underlying this lawsuit.

form." Id. ¶ 33. "In a March, 21, 2011 report to Congress, President Obama claimed authority for U.S. military action in Libya pursuant to his 'constitutional authority to conduct U.S. foreign relations and as Commander in Chief and Chief Executive.'" Id. ¶ 108 (quoting Mar. 21, 2011 Letter from President Barack Obama to Speaker of the House and President Pro Tempore of the Senate). On March 31, 2011, the North Atlantic Treaty Organization ("NATO") officially assumed command of the military operations in Libya, including the command of U.S. forces, id. ¶ 40, although the President and the Secretary of Defense still "hold ultimate command authority over U.S. troops operating under NATO command," id. ¶ 49. The Obama Administration "never received the approval of Congress for committing U.S. military forces to the NATO operation in Libya." Id. ¶ 48.

Prior to this initiation of military force, "Libya did not attack the United States or any NATO member," id. ¶ 44, nor has Libya been "cited as a threat to the United States or any NATO member," id. ¶ 45. Further, President Obama has explained that the U.S. military actions in Libya are "not a response to a direct threat to the United States or even an effort to combat terrorism." Id. ¶ 57. "The Obama Administration has denied that the Libyan operations are a war and, on March 24, 2011, White House Spokesman Jay Carney stated that the Administration had defined these combat operations as a 'time-limited, scope-limited military action.'" Id. ¶ 75. "On May 20, 2011, President Obama sent a letter to congressional leadership informing it that th[e] Administration [had] concluded that the War Powers Resolution [did] not apply to the U.S. involvement in Libya because of the limited nature of that involvement." Id. ¶ 139. Then, on June 3, 2011, the House of Representatives passed a resolution "declaring that the President shall not deploy, establish, or maintain the presence of units and member of the [U.S.] Armed Forces

on the ground in Libya.  Id.  ¶ 143. "On June 14, 2011, Speaker [of the House John] Boehner

sent a letter to President Obama informing him that the ninety-day period under the War Powers

Resolution would pass on June 17th and that the President ha[d] failed to comply with the

statute."[3] Id. ¶ 142.

As of June 15, 2011, the date on which the complaint commencing this litigation was

filed, "the Obama Administration had yet to ask Congress for specific funding for the" military

action in Libya, id. ¶ 84, nor had the Administration sought "a declaration of war from Congress

or even congressional approval for the" military action, id. ¶ 85.  The military actions undertaken

by the United States in Libya appear to have been funded "in large part through [the] use of

general funds appropriated by Congress."  Id. ¶ 86.  The plaintiffs point to information from the

Department of Defense, estimating that the Administration had, within the first ten days of U.S.

military action in Libya, expended approximately $550 million in the Libyan rebellion.  Id. ¶ 87.

"These funds have been made available through 'cash flowing,' by which the Department of

Defense reallocates funds originally dedicated for other purposes.  While these funds may allow

for broad discretionary spending, [the plaintiff contends that] the Administration has asserted the

right to use these funds for an unauthorized war."  Id. ¶¶ 90-91.  Congress has apparently "set

aside funds for Overseas Contingency Operations," id. ¶ 92, which "can be used only for

'contingency operations directly related to the global war on terrorism,'" id. ¶ 93 (source of

internal quotation not attributed in original), but President Obama "has never claimed that the

Libyan War commenced as an anti-terrorism operation," id. ¶ 94.  According to the plaintiffs,

"[t]he Administration appears to have expended over $750 million for the Libyan War from

---

[3]     The War Powers Resolution requires that military actions commenced by the President must be terminated
if, after sixty days, Congress has not declared war or authorized the use of military forces.  50 U.S.C. § 1544; see
also Compl. ¶ 130.

discretionary funds without any authorization to use these funds to prosecute a war in Libya." Id. ¶ 96. And the plaintiffs represent that the President's use of these funds has "circumvented the need to seek authorization of funding from Congress until the war has been prosecuted for months." Id. ¶ 100.

The plaintiffs are ten members of Congress. Id. ¶¶ 9-18. Their complaint seeks and Order from this Court: (1) declaring that the military operations in Libya constitute a war for the purposes of Article I of the United States Constitution and are therefore unconstitutional absent a declaration of war from Congress; (2) declaring unconstitutional the policy that the President may unilaterally extend the North Atlantic Treaty to cover military operations against a country that had not attacked a NATO country; (3) declaring unconstitutional the policy that the President may unilaterally extend the North Atlantic Treaty to cover combat operations without satisfying the constitutional process of the United States; (4) declaring unconstitutional the policy of the Administration that a United Nations resolution can negate the obligation of the President to seek approval of a war or military operations from Congress; (5) declaring unconstitutional the policy of the Administration that the President may use previously appropriated funds to support "an undeclared war"; (6) providing injunctive relief suspending all U.S. military operations in Libya absent a declaration of war from Congress; and (7) awarding attorneys' fees and costs to the plaintiffs. Id. at 35-36 ¶¶ a-i.

On August 19, 2011, the defendants responded to the plaintiffs' complaint by filing the motion to dismiss that is the subject of this Memorandum Opinion. The defendants assert that the complaint must be dismissed because the claims alleged in the complaint are nonjusticiable. Defs.' Mem. at 3. Essentially, the defendants maintain that the plaintiffs have not satisfied the

elements of legislative or taxpayer standing, id. at 1-2, and that the plaintiffs' claims raise political questions that are "inappropriate for judicial resolution," id. at 2. The plaintiffs, not surprisingly, contest the defendants' challenges, maintaining that they have demonstrated both legislative, Pls.' Mem. at 13, and taxpayer standing, id. at 22, and that their challenges to U.S. military action in Libya do not present political questions, id. at 30. The Court will evaluate each argument in turn.

## II.      STANDARD OF REVIEW

The defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(1). Rule 12(b)(1) provides for the dismissal of claims for which the factual allegations in the complaint do not sufficiently establish the court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). In deciding a motion to dismiss challenging the Court's subject-matter jurisdiction under this Rule, a court "must accept as true all of the factual allegations contained in the complaint" and draw all reasonable inferences in favor of the plaintiff, Brown v. District of Columbia, 514 F.3d 1279, 1283 (D.C. Cir. 2008), but courts are "not required . . . to accept inferences unsupported by the facts or legal conclusions that are cast as factual allegations," Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001). Additionally, the "court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case." Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000). Ultimately, however, the plaintiff bears the burden of establishing the Court's jurisdiction, Rasul v. Bush, 215 F. Supp. 2d 55, 61 (D.D.C. 2002), and where subject-matter jurisdiction does not exist, "the court cannot proceed at all in any cause," Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998).

## III.    LEGAL ANALYSIS

"Federal courts are courts of limited jurisdiction[, possessing] only that power authorized by Constitution and statute," <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 377 (1994), and it is a "fundamental axiom" that Article III of the Constitution bestows upon federal courts "the power of judicial review extending only to 'Cases' and 'Controversies,'" <u>Mahorner v. Bush</u>, 224 F. Supp. 2d 48, 49 (D.D.C. 2002) (quoting U.S. Const. art. III, § 2).   "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine."   <u>Nat'l Treasury Employees Union v. United States</u>, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (quoting <u>Allen v. Wright</u>, 468 U.S. 737, 750 (1984)); <u>see also</u> <u>Kucinich v. Bush</u>, 236 F. Supp. 2d 1, 3 (D.D.C. 2002) (observing that the justiciability doctrines "all arise out of the 'bedrock requirement' that courts hear only 'cases and controversies'" (quoting <u>Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 471 (1982))).   Because the Supreme Court has explained that "[t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines,'" <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 230 (1990) (quoting <u>Allen</u>, 468 U.S. at 750), the Court will begin its analysis in this case by addressing the parties' arguments regarding standing.

A.  <u>Standing</u>

"Article III standing requires that a plaintiff have suffered an (1) 'injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'—(2) which is 'fairly traceable' to the challenged act,

and (3) 'likely' to be 'redressed by a favorable decision.'" <u>Nat'l Treasury Employees Union</u>, 101

F.3d at 1427 (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).  The Supreme

Court has "consistently stressed that a plaintiff's complaint must establish that he has a 'personal

stake' in the alleged dispute, and that the alleged injury suffered is particularized to him." <u>Raines</u>

<u>v. Byrd</u>, 521 U.S. 811, 819 (1997).  Moreover, the "standing inquiry has been especially rigorous

when reaching the merits of the dispute would force [a court] to decide whether an action taken

by one of the other two branches of the Federal Government was unconstitutional." <u>Id.</u> at 819-

20.  With these fundamental principles as the framework for its analysis, the Court will examine

the two rationales on which the plaintiffs assert that their claims are properly before the Court—

legislative standing and taxpayer standing.

1)   <u>Legislative standing</u>

As another member of this Court observed almost nine years ago, "[t]he question whether

members of Congress have standing to sue Executive Branch officials is neither novel nor

unsettled."[4] <u>Kucinich v. Bush</u>, 236 F. Supp. 2d 1, 4 (D.D.C. 2002) (Bates, J.).  Judge Bates was,

of course, referring to a line of cases that have all but foreclosed the idea that a member of

Congress can assert legislative standing to maintain a suit against a member of the Executive

Branch.  <u>Raines v. Byrd</u>, 521 U.S. 811 (1997), was decided by the Supreme Court in 1997, and

has since been interpreted by the District of Columbia Circuit with its two decisions in

---

[4] Interestingly, Representative Kucinich, the lead plaintiff in <u>Kucinich v. Bush</u>, the case in which these words were written, is the lead plaintiff in this case in which members of Congress are again attempting to bring an action against Executive Branch officials.  Indeed, the plaintiffs "acknowledge the contrary result" reached by the District of Columbia Circuit in a case also involving alleged presidential violations of the War Powers Clause and the War Powers Resolution.  <u>See</u> Pls.' Opp'n at 17.  While there may conceivably be some political benefit in suing the President and the Secretary of Defense, in light of shrinking judicial budgets, scarce judicial resources, and a heavy caseload, the Court finds it frustrating to expend time and effort adjudicating the relitigation of settled questions of law.  The Court does not mean to imply that the judiciary should be anything but open and accommodating to all members of society, but is simply expressing its dismay that the plaintiffs are seemingly using the limited resources of this Court to achieve what appear to be purely political ends, when it should be clear to them that this Court is powerless to depart from clearly established precedent of the Supreme Court and the District of Columbia Circuit.

Chenoweth v. Clinton, 181 F.3d 112 (D.C. Cir. 1999), and Campbell v. Clinton, 203 F.3d 19 (D.C. Cir. 2000). See Campbell, 203 F.3d at 20 ("The question whether congressmen have standing in federal court to challenge the lawfulness of actions of the executive was answered, at least in large part, in the Supreme Court's recent decision in Raines v. Byrd."). Judge Bates' thorough analysis of the issues presented in Kucinich v. Bush further underscored the very limited circumstances in which a member of Congress might successfully assert legislative standing. See 236 F. Supp. 2d at 7-9 (describing the ways in which Raines, Chenoweth, and Campbell all reject the assertion of "institutional injury" as grounds for legislative standing).

      a)  <u>Do the plaintiffs' allegations support a conclusion that they claim something other than a purely institutional injury?</u>

In Raines, the Supreme Court held that members of Congress did not have standing to challenge the constitutionality of the Line Item Veto Act, which authorized the President to "cancel" specific portions of appropriations legislation without vetoing the entire legislation. 521 U.S. at 814-15. The Raines plaintiffs, four Senators and two Representatives, had all voted against the bill, but it was ultimately passed by both houses of Congress and signed by the President. Id. at 814. The plaintiffs asserted that the Act injured them in three ways: (1) by altering "the legal and practical effect of all votes they may cast on bills containing such separately vetoable items," (2) by divesting them of "their constitutional role in the repeal of legislation," and (3) by altering the "constitutional balance of powers between the Legislative and Executive Branches, both with respect to measures containing separately vetoable items and with respect to other matters coming before Congress." Id. at 816 (internal quotation marks omitted). The Court began its analysis by focusing on the nature of the injuries alleged:

First, appellees have not been singled out for specially unfavorable treatment as opposed to other Members of their respective bodies. Their claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally. Second, appellees do not claim that they have been deprived of something to which they personally are entitled—such as their seats as Members of Congress after their constituents had elected them. Rather, appellees' claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete.

Id. at 821 (internal citations omitted). The Court next distinguished the case before it from its prior holding in Coleman v. Miller, 307 U.S. 433 (1939), where it had deemed a group of Kansas legislators to have standing to bring a mandamus action when the Kansas Lieutenant Governor cast a deciding vote in favor of ratifying an amendment that had been rejected by the legislators, Raines, 521 U.S. at 822, by explaining that "Coleman stands (at most) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified," id. at 823. Further differentiating the case before it from Coleman, the Court explained, "[i]n the vote on the [Line Item Veto] Act, [the plaintiffs'] votes were given full effect. They simply lost that vote." Id. at 824. The Court then continued, "[t]here is a vast difference between the level of vote nullification at issue in Coleman and the abstract dilution of institutional legislative power that is alleged here." Id. at 826. Lastly, the Court observed that its conclusion "neither deprive[d] Members of Congress of an adequate remedy (since they may repeal the act or exempt appropriations bills from its reach), nor foreclose[d] the Act from constitutional challenge (by someone who suffers judicially cognizable injury as a result of the Act)." Id. at 829.

Attempting to distinguish their case from Raines, the plaintiffs' maintain that "[t]his is not a case in which [their] legislative efforts have failed and they are seeking instead to accomplish their legislative objective through the courts." Pl.'s Opp'n at 16. Rather, they contend that they have stated "direct and concrete harm as a result of President Obama's continuing unilateral commitment of U.S. military forces in Libya." Id. at 13. "Specifically, they allege (1) the deprivation of their constitutionally prescribed role in voting to initiate war, and (2) the effective nullification of their votes against authorizing a continuation of hostilities in Libya."[5] Id.

Despite the plaintiffs' protestations to the contrary, the Court concludes that "this case is squarely within the holding of Raines," Kucinich, 236 F. Supp. 2d at 4, as one in which the plaintiffs primarily allege "the abstract dilution of institutional legislative power," id. at 5-6 (quoting Raines, 521 U.S. at 812). For example, the plaintiffs' first claimed injury, that "the President's unilateral commitment of U.S. military forces in Libya has deprived [them] of an opportunity to exercise their constitutionally prescribed role in initiating war," Pls.' Opp'n at 16, strikes the Court as an allegation of a purely institutional injury of the nature prohibited by Raines. See Campbell, 203 F.3d at 22 (relying on Raines to reject the "constitutional argument that the President ha[d] acted illegally—in excess of his authority—because he waged war in the constitutional sense without a congressional delegation"). Indeed, the plaintiffs' own argument that "there should be no distinction between an executive official illegally voting to ratify an

_____

[5] This second allegation seems to refer to a House of Representatives' vote held on June 24, 2011. See Pls.' Opp'n at 17. According to the plaintiffs, "on June 24, 2011, each of the plaintiffs voted with the overwhelming majority of members against House Resolution 68, which would have authorized the 'limited use' of U.S. military forces 'in support of the NATO mission in Libya.'" Id. (quoting 157 Cong. Rec. H4549 (daily ed. June 24, 2011)). This vote having occurred after the filing of the June 15, 2011 complaint, factual allegations regarding this vote are understandably absent from the complaint. The June 24, 2011 House of Representatives vote on House Resolution 68 may nonetheless be considered by the Court because, as previously noted, the "court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case." Scolaro, 104 F. Supp. 2d at 22.

otherwise defeated constitutional amendment and a president simply not submitting a matter for a required vote," Pls.' Opp'n at 18, demonstrates that the injury here (assuming that an injury does, in fact, exist, see Campbell, 203 F.3d at 23-24 ("At the standing stage we must take as correct appellants' claim that the President violated the Constitution simply by ordering U.S. forces to attack Yugoslavia")), impacts the whole of Congress—not solely the ten plaintiffs' before the Court.  In other words, President Obama's actions have deprived each of the 435 members of the House of Representatives of a vote, and this deprivation is felt no more acutely by the ten plaintiffs here as compared to their 425 colleagues.[6]  As there is nothing making this deprivation uniquely personal to the ten Members before the Court, the plaintiffs' argument, at its core, is exactly that expressed by the plaintiffs in Raines—that the President's actions have "'alter[ed] the constitutional balance of powers between the Legislative and Executive Branches,' to their detriment."  Chenoweth, 181 F.3d at 116 (quoting Raines, 521 U.S. at 816).  And, "[s]imply put, Raines teaches that generalized injuries that affect all members of Congress in the same broad and undifferentiated manner are not sufficiently 'personal' or 'particularized,' but rather are institutional, and too widely dispersed to confer standing."  Kucinich, 236 F. Supp. 2d at 7.

Furthermore, the Supreme Court's decision in Raines was premised in part on the fact that the legislators in that case did not initiate their lawsuit on behalf of their respective legislative bodies.  See Raines, 521 U.S. at 829 ("attach[ing] some importance to the fact that appellees

---

[6]     The Court recognizes that as of the June 24, 2011 vote, there were apparently three vacancies in the House of Representatives.  See Office of the Clerk of the U.S. House of Representatives, Current Vacancies, http://clerk.house.gov/member_info/vacancies.aspx?pr_not_available=1 (last visited October 18, 2011) (detailing vacancies in the following districts on June 24, 2011: Oregon, 1st; Nevada, 2nd; and, California, 36th).  Other than perhaps altering the total number of members who took part in the June 24, 2011 vote, these vacancies in no way change the Court's analysis of the parties' arguments or the Court's conclusion that the plaintiffs allege nothing more than an institutional injury.

ha[d] not been authorized to represent their respective House of Congress in [the] action."). Here, there has been no indication from the plaintiffs that they have initiated this litigation at the behest of the House of Representatives as a whole—to the contrary, they speak for themselves, not the House of Congress in which they serve. See Defs.' Mem. at 6 (observing that the ten plaintiffs have not been authorized to represent the House, and that there are no plaintiff members from the Senate); id. at 24 ("It must be remembered that the ten plaintiffs before the Court represent less than three percent of the House, let alone the entire Congress, and thus their request for extraordinary relief asks this Court to substitute the views of these ten legislators for the position of Congress as a whole."). Thus, the facts that "there is no claim that Congress, as an institution, has asserted [that] its role" in the constitutional process has been diminished, and that "there is certainly nothing to suggest that [the plaintiff legislators] speak on behalf of Congress as whole," both "counsel[] strongly against a conclusion that the exercise of judicial power at this time is warranted as a 'last resort, and as a necessity.'" Kucinich, 236 F. Supp. 2d at 12 (quoting Allen, 468 U.S. at 752).

The plaintiffs' first justification for why they are entitled to legislative standing—that they have been deprived of their constitutionally prescribed role in declaring war—therefore fails to establish this Court's jurisdiction over their claims.

b) Do the plaintiffs' allegations support a conclusion that their votes were nullified?

Next, presumably attempting to demonstrate that their circumstances parallel those in Coleman where the Supreme Court found standing based on "the ground that [the plaintiff legislators'] votes ha[d] been completely nullified," Raines, 521 U.S. at 823, the plaintiffs assert that "the effective nullification of their votes against authorizing a continuation of hostilities in

Libya," Pls.' Opp'n at 13, is a concrete injury that entitles them to legislative standing.  As noted

above, Raines drew distinctions between the general, institutional injury before it and the "level

of vote nullification at issue in Coleman," Raines, 521 U.S. at 826.  In a case with facts strikingly

similar to those presented here, the District of Columbia Circuit explored what, exactly, the

Supreme Court meant with its use of the word "nullify":

> It is, to be sure, not readily apparent what the Supreme Court meant by that word.
> It would seem the Court used nullify to mean treating a vote that did not pass as if
> it had, or vice versa.  The "nullification" alleged in this case therefore differs from
> Coleman in a significant respect.  In that case state officials endorsed a defeated
> ratification, treating it as approved, while the President here did not claim to be
> acting pursuant to the defeated declaration of war or a statutory authorization, but
> instead "pursuant to [his] constitutional authority to conduct U.S. foreign relations
> and as Commander-in-Chief and Chief Executive."  The Court did not suggest in
> Raines that the President "nullifies" a congressional vote and thus legislators have
> standing whenever the government does something Congress voted against, still
> less that congressmen would have standing anytime a President allegedly acts in
> excess of statutory authority. As the government correctly observes, appellants'
> statutory argument, although cast in terms of the nullification of a recent vote,
> essentially is that the President violated the quarter-century old War Powers
> Resolution.

Campbell, 203 F.3d at 22 (citations omitted).  The Circuit continued its comparison of Coleman

and Raines, observing that

> [t]he Coleman senators . . . may well have been powerless to rescind a ratification
> of a constitutional amendment that they claimed had been defeated.  In other
> words, they had no legislative remedy.  Under that reading—which we think
> explains the very narrow possible Coleman exception to Raines—appellants fail
> because they continued, after the votes, to enjoy ample legislative power to have
> stopped the prosecution of the "war."

Id. at 23.  It is clear, then, that "nullification" necessitates the absence of a legislative remedy.  In

other words, in order for the "very narrow," id., Coleman exception to apply and support a

finding of legislative standing, plaintiff legislators must be without legislative recourse before

they may turn to the courts to seek their desired remedy.  See Kucinich, 236 F. Supp. 2d at 9

(opining that "[t]he conclusion that [the] plaintiffs do not have standing is reinforced by the fact that, in addition to seeking judicial resolution, they have a number of other, equally effective remedies available to pressure the President to obtain congressional consent").

Although the plaintiffs rely on Coleman to argue that "their votes against authorizing continued U.S. military involvement in Libya have been ignored and 'virtually held for naught,'" Pls.' Opp'n at 13 (citing Coleman, 307 U.S. at 438); see also id. at 16 (contending that "[t]he President's commitment of U.S. military forces in Libya has denied [the p]laintiffs the effectiveness of their votes to limit the scope of U.S. military actions in Libya and to reject authorization of continued hostilities"), they have failed to satisfy the Coleman exception as they have not demonstrated that they are without a legislative remedy. See Defs.' Mem. at 8 ("[The p]laintiffs are fully able, in their legislative capacities, to seek their desired goal."). Indeed, rather than disputing the existence of a legislative remedy, the plaintiffs assert that "[t]he existence of the violation (and the right to independent review) should not depend on whether judges believe Congress could fight back in other ways." Pls.' Opp'n at 19; see also id. ("Moreover, this reliance on alternative avenues of relief ignores the possibility that Congress could be entirely passive in the face of presidential abuses. . . . The mere fact that the majority of members of Congress may prefer to avoid their responsibility under Article I is of no import."). By contending that their votes were nullified, despite seemingly acknowledging that they retain legislative remedies, the plaintiffs' arguments overlook the important role political remedies have in the standing analysis. "In the end, the availability of effective political remedies goes to the very heart of the standing analysis: '[T]he law of Art[icle] III standing is built on a single basic

idea—the idea of separation of powers.'" Kucinich, 236 F. Supp. 2d at 11 (quoting Raines, 521 U.S. at 829).

Here, in light of the authorities discussed above, the plaintiffs' nullification arguments fail for a number of reasons. First, as was likewise true in Campbell, the President is not in any way basing his authority to deploy U.S. forces on the plaintiffs' June 24, 2011 vote. See Compl. ¶ 108; Pls.' Opp'n at 18 ("As in Campbell, President Obama claims to be acting pursuant to his constitutional authority as Commander-in-Chief."). The President's actions, being based on authority totally independent of the June 24, 2011 vote, cannot be construed as actions that nullify a specific Congressional prohibition.

Second, not only do the plaintiffs retain legislative remedies,[7] the plaintiffs

> and their colleagues continue to debate these legislative options and have already voted on numerous bills that would impact operations in Libya . . . [; however] the House has at least twice rejected proposals (including one sponsored by plaintiff Kucinich) to defund [U.S.] military operations in Libya and has voted down a resolution sponsored by plaintiff Kucinich directing immediate withdrawal of [U.S.] armed forces pursuant to the War Powers Resolution.

Defs.' Mem. at 8. It therefore appears that the House of Representatives has voted on essentially what the plaintiffs now ask this Court to award (i.e., an order requiring the President to cease all U.S. military action in Libya). Thus, the plaintiffs' "votes were given full effect. They simply lost that vote." Raines, 521 U.S. at 824. Furthermore, unlike in Raines where the plaintiffs filed their lawsuit the day after the President signed into law the legislation they had voted against, id. at 814, the plaintiffs here have been attempting to invoke their legislative remedies (i.e., holding votes on defunding military operations or directing the withdrawal of U.S. troops from Libya)

---

[7] In Campbell, the Circuit highlighted three potential legislative remedies to stop the prosecution of U.S. military action in Yugoslavia as ordered by President Clinton: (1) passing a law to forbid the use of U.S. forces in the Yugoslav campaign, (2) utilizing the Congressional appropriations authority, and (3) impeachment. 203 F.3d at 23.

while at the same time seeking this Court's intervention.  This double-pronged approach to achieving their desired results belies their arguments for legislative standing.[8]

        2)      Taxpayer standing

"As the Supreme Court has repeatedly held, a taxpayer's interest in ensuring that appropriated funds are spent in accordance with the Constitution does not suffice to confer Article III standing."  In re Navy Chaplaincy v. U.S. Navy, 534 F.3d 756, 761 (D.C. Cir. 2008) (citing Hein v. Freedom from Religion, 551 U.S. 587, 599 (2007)).  Forty-five years after it rejected the idea that standing could be premised on one's status as a taxpayer in Frothingham v. Mellon, 262 U.S. 447 (1923), the Supreme Court decided Flast v. Cohen, 392 U.S. 83 (1968), and "carved out a narrow exception to the general constitutional bar on taxpayer suits."  Navy Chaplaincy, 534 F.3d at 761; see also id. ("The Court has subsequently made clear that Flast is a very narrow exception to the general bar against taxpayer standing.").  Flast established a two-part test for evaluating taxpayer standing.  See Flast, 392 U.S. at 102 ("The nexus demanded of federal taxpayers has two aspects to it.").  "First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked.  Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the [T]axing and [S]pending [C]lause of Art[icle] I, [§] 8, of the Constitution."  Id.  "Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional

_____

[8]      The plaintiffs argue that this case can be distinguished from Campbell because Campbell "did not involve . . . claims ranging from treaty violations to [the] misuse of appropriated funds to the existence of a new stated and sweeping policy on interventions."  Pls.' Opp'n at 21.  However, because it is clear that all of the plaintiffs' claims arise from the same allegations of injury to their legislative interests, this argument fails.  For example, the plaintiffs' fourth claim for relief concerns the scope of the President's authority under the NATO treaty, Compl. ¶¶ 186-196, as the plaintiffs seek an order from this Court "declaring unconstitutional the policy that the President may unilaterally extend the North Atlantic Treaty to cover combat operations against a country without satisfying the constitutional process of the United States, including the necessity of seeking authority from Congress," id. at 35, ¶ c.  The plaintiffs' additional claims do not, therefore, alter the Court's analysis of the plaintiffs' asserted injuries.

infringement alleged."  Id.  Therefore, "according to Flast, taxpayers may bring an Establishment

Clause challenge only when they challenge legislation passed pursuant to the Taxing and

Spending Clause in Article I, § 8 of the Constitution."  Navy Chaplaincy, 534 F.3d at 761.

Underscoring the narrowness of the Flast exception,

> in its recent decision in Hein, the [Supreme] Court declined to expand Flast to
> encompass discretionary Executive Branch spending: "Because almost all
> Executive Branch activity is ultimately funded by some congressional
> appropriation, extending the Flast exception to purely executive expenditures
> would effectively subject every federal action—be it a conference,
> proclamation[,] or speech—to Establishment Clause challenge by any taxpayer in
> federal court."

Id. at 762 (quoting Hein, 551 U.S. at 589).

> a)  Do the plaintiffs' allegations satisfy the first element of the Flast test?

The defendants argue that the "plaintiffs here do not purport to challenge any action

expressly authorized by the legislative branch."  Def.'s Mem. at 10.  The plaintiffs respond that

"[t]he Supreme Court has specifically held that taxpayer standing can apply in suits against an

Executive Branch officer."  Pls.' Opp'n at 23.  The plaintiffs acknowledge that for taxpayer

standing to apply, the challenged spending must be expressly authorized by Congress, and assert

that this requirement "is clearly satisfied in the present case."  Id. at 24.  Specifically, the

plaintiffs point to appropriations made by Congress "through the Overseas Contingency

Operations fund and other statutes" that enable the President to undertake military actions.  Id.

The defendants reply by asserting that even if "there is generally available funding for overseas

operations from which the Executive Branch is entitled to draw on a discretionary basis to

support operations, taxpayer standing does not 'encompass discretionary Executive Branch

spending.'"  Defs.' Reply at 8 (quoting Navy Chaplaincy, 534 F.3d at 762).  Because the cases

relied upon by the plaintiffs are distinguishable from this case, the Court agrees with the defendants that the "plaintiffs are foreclosed from asserting taxpayer standing to challenge actions of the Executive that are not only alleged to be discretionary, but are in fact alleged in the Complaint to be contrary to the intent of Congress in appropriating such funds." Defs.' Reply at 9.

The plaintiffs rely on <u>Bowen v. Kendrick</u>, 487 U.S. 589 (1988), for the proposition that a taxpayer may be deemed to have standing in a suit against an Executive Branch officer. Pls.' Opp'n at 23. As the plaintiffs themselves acknowledge, <u>see id.</u> at 24 n.9, <u>Bowen</u> analyzed a specific statute, the Adolescent Family Life Act ("AFLA"), 487 U.S. at 593, and whether a group of taxpayers had standing, based merely on their status as taxpayers, to challenge the application of that statute, <u>id.</u> at 618. As described by the Supreme Court, "the AFLA [was] essentially a scheme for providing grants to public or nonprofit private organizations or agencies for services and research in the area of premarital adolescent sexual relations and pregnancy." <u>Id.</u> at 593 (internal quotation marks omitted). The AFLA expressly provided for the involvement of, among other people and groups, religious organizations, <u>id.</u> at 596, and it was "undisputed that a number of grantees or subgrantees were organizations with institutional ties to religious denominations," <u>id.</u> at 597. Although the greater part of <u>Bowen</u> examines questions related to the Establishment Clause itself, the Court did briefly "consider whether the appellees had standing to raise th[e] claim [that the AFLA was unconstitutional as applied]." <u>Id.</u> at 618. The appellants argued that the appellees' standing was "deficient" because an as-applied challenge was "really a challenge to executive action, not to an exercise of congressional authority under the Taxing and Spending Clause." <u>Id.</u> at 619. The Supreme Court disagreed, however,

determining that "[w]e do not think . . . that appellees' claim that AFLA funds are being used improperly by individual grantees is any less a challenge to congressional taxing and spending power simply because the funding authorized by Congress has flowed through and been administered by the Secretary" of Health and Human Services.  Id.  The Court concluded that the "AFLA [wa]s at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and appellees' claims call[ed] into question how the funds authorized by Congress [were] being disbursed pursuant to the AFLA's statutory mandate."  Id. at 619-20.

The plaintiffs next cite American Jewish Congress v. Corporation for National and Community Service ("AJC"), 399 F.3d 351 (D.C. Cir. 2005), as permitting taxpayer standing in suits against the Executive Branch.  See Pls.' Opp'n at 23-24.  In AJC, the District of Columbia Circuit considered whether portions of the AmeriCorps Education Awards Program had the effect of advancing religion in violation of the Establishment Clause.  399 F.3d at 354.  The awards expanded educational opportunities for those who participated in national service programs, and the case itself "involve[d] only individuals who fulfill[ed] their service requirement as teachers in religious schools."  Id.  After discussing the Flast exception to the rule that there is no general taxpayer standing, the Circuit explained:

> Whatever doubt there might have been before Bowen v. Kendrick, it is now clear that the exception includes more than just taxpayer suits, based on the Establishment Clause, attacking taxing-and-spending statutes on their face.  Also within the exception are taxpayer actions claiming a violation of that constitutional provision because of the manner in which the Executive Branch is administering the statute.

AJC, 399 F.3d at 355 (internal citation omitted).  The Circuit then concluded that the circumstances in AJC "fit[] comfortably within the rationale of Bowen," and determined that

taxpayer standing could be asserted to challenge the Awards Program because it was a program of disbursement of funds pursuant to Congress' taxing and spending power.  Id. at 356.

Both Bowen and AJC are of little assistance to the plaintiffs in their attempt to convince the Court that they may maintain this action on the basis of their status as taxpayers.  First, and most obviously, the constitutional violations alleged in Bowen and AJC were infringements of the Establishment Clause—the very constitutional limitation on congressional spending that gave rise to the Flast exception and, to date, some forty-three years after Flast was decided, the only constitutional limitation to have been recognized as conferring taxpayer standing.  See Defs.' Reply at 7 ("[The p]laintiffs do not dispute that their taxpayer standing arguments ask this Court to be the first to recognize taxpayer standing for claims, unrelated to the Establishment Clause, against the alleged expenditure of funds by the Executive Branch . . . . ").  Second, and more important here, the disbursements challenged in Bowen and AJC were all made pursuant to Congress' taxing and spending power in accordance with the provisions established by Congress in the respective statutes at issue in those cases.  Even though the expenditures were ultimately made by members of the Executive Branch, those members were simply acting as the administrators of the respective statutes.  Thus, the injuries alleged in those cases were caused by Congress authorizing the disbursements of the funds, not the executive officials who actually distributed the expenditures.  It stands to reason, then, that in order for a court to find a sufficient nexus between a taxpayer and the congressional exercise of the taxing and spending power, the important question is not who is ultimately making the disbursements, but why, or on what basis, such appropriations are expended.  See AJC, 399 F.3d at 356 ("It follows that there is 'a sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of

taxing and spending power, notwithstanding the role the [Corporation] plays in administering the statute.'" (quoting Bowen, 487 U.S. at 620)); Hein, 551 U.S. at 607 (explaining that "the key" to the taxpayer standing holding in Bowen was the fact that the AFLA "'was at heart a program of disbursements of funds pursuant to Congress' taxing and spending powers,' and that the plaintiffs' claims 'called into question how the funds authorized by Congress [were] being disbursed pursuant to the AFLA's statutory mandate'") (quoting Bowen, 487 U.S. at 619-20)). Therefore, while Bowen and AJC may have slightly modified the landscape of taxpayer standing, they did not alter the bedrock underlying that landscape: taxpayer standing will be successful only when asserted in the face of spending authorized and directed by Congress.

Here, the plaintiffs have not established the requisite nexus between their status as taxpayers and a challenged act of congressional spending. Although the plaintiffs do not make consistent arguments regarding the challenged spending, see Defs.' Reply at 7 (noting the plaintiffs' "confusing (and apparent change in) position"), both of the plaintiffs' assertions fail, for several reasons, to demonstrate that the spending they challenge here was authorized or directed by Congress. First, in their Complaint, the plaintiffs allege that the financing of the U.S. military action in Libya by funds drawn from those set aside by Congress for Overseas Contingency Operations contravenes Congress' intent in appropriating those funds. See Compl. ¶ 93-94 (asserting that the contingency funds may be used only for activities directly related to the war on terrorism, and maintaining that the U.S. actions in Libya were not commenced in connection with an anti-terrorism effort). Obviously, if the funds at issue here are being utilized in a manner contrary to the will of Congress, this case does not present a situation in which a member of the Executive Branch is simply carrying out the will of Congress by acting pursuant

to a statutory mandate; for this reason, this case is unlike both <u>Bowen</u> and <u>AJC</u>.  Second, in their

opposition to the defendants' motion to dismiss, the plaintiffs retreat from the allegations

advanced in their complaint and now argue that the appropriations made by Congress for

Overseas Contingency Operations suffice as expressly authorized congressional spending.  Pls.'

Opp'n at 24.  The plaintiffs seemingly wish the Court to view the contingency funds used by the

President to finance the efforts in Libya as paralleling the AFLA in <u>Bowen</u> and the Awards

Program in <u>AJC</u>.  In other words, the plaintiffs appear to maintain that the contingency funds are

"at their heart, a program of disbursement of funds pursuant to Congress' taxing and spending

power," <u>Bowen</u>, 487 U.S. at 619, and that the President is merely administering the funds

pursuant to statutory mandate.  Such comparisons are unavailing.  Rather than administering the

contingency funds in accordance with a specific statutory mandate, the President is using funds

that Congress apparently appropriated specifically for discretionary use.  And it is beyond cavil

that the "very narrow," <u>Navy Chaplaincy</u>, 534 F.3d at 761, <u>Flast</u> exception does not "encompass

discretionary Executive Branch spending," <u>id.</u> at 762.  Furthermore, in the absence of any

authority interpreting the War Powers Clause as a specific limitation on congressional spending,

and in light of the plaintiffs' failure to advance any convincing arguments as to why this Court

should be the first to do so, the Court declines to construe the War Powers Clause in the same

manner that other courts have construed the Establishment Clause—as a specific, textual limit on

congressional spending.  <u>See</u> <u>Ariz. Christian Sch. Tuition Org. v. Winn</u>, __ U.S. __, __, 131 S.

Ct. 1436, 1445 (2011) ("Confirming that <u>Flast</u> turned on the unique features of Establishment

Clause violations, [the Supreme] Court has 'declined to lower the taxpayer standing bar in suits

alleging violations of any constitutional provision apart from the Establishment Clause.'")

(quoting <u>Hein</u>, 551 U.S. at 609).  Accordingly, because it is clear that for taxpayer standing to

apply the allegedly unconstitutional expenditures must stem from congressional spending, and

because the military actions challenged by the plaintiffs do not arise from expenditures expressly

authorized by Congress, the plaintiffs have failed to satisfy the first element of the <u>Flast</u>

exception and therefore do not have standing to bring this action as taxpayers.[9]

## IV.    CONCLUSION

"It is evident that" the plaintiffs are "firmly committed" to ending U.S. military actions in

Libya, "but standing is not measured by the intensity of the litigant[s'] interest or the fervor of

[their] advocacy."  <u>Valley Forge Christian Coll.</u>, 454 U.S. at 765-66.  Thus, for the reasons

explained above, the Court concludes that the plaintiffs have failed to demonstrate that they have

standing—either in their capacity as Members of the House of Representatives or because of

their status as taxpayers—to maintain this action.  Accordingly, the Court will grant the

defendants' motion to dismiss this case for lack of subject-matter jurisdiction.[10]

**SO ORDERED** this 20th day of October, 2011.

REGGIE B. WALTON
United States District Judge

---

[9]      As the Court has concluded that the plaintiffs lack standing to bring the claims alleged in their complaint, it need not proceed to the related issue of whether the plaintiffs' claims present nonjusticiable political questions.  <u>See</u> <u>Schlesinger v. Reservists Comm. to Stop the War</u>, 418 U.S. 208, 215 (1974) (observing that each of the justiciability doctrines "poses a distinct and separate limitation, so that either the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the complaining party") (citing <u>Powell v. McCormack</u>, 395 U.S. 486, 512 (1969)).

[10]      The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.